# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| OMAR MARTÍNEZ-MORALES, et al., | |
| Plaintiffs, | |
| v. | CIVIL NO. 11-1660 (MEL) |
| VICTAULIC CO., et al., | |
| Defendants. | |

## OPINION AND ORDER

Pending before the court is a motion *in limine* filed by defendant Victaulic Co. ("defendant" or "Victaulic"), along with plaintiffs' response in opposition, defendant's reply, and plaintiffs' surreply.  (D.E. 43; 51; 60; 69).  Defendant seeks the exclusion of the testimony of plaintiffs' expert witness Dr. Jaime L. del Valle Caballero ("Dr. del Valle") under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).[1]

## I.  ANALYSIS

Plaintiffs seek to present testimony from Dr. del Valle Caballero as an expert witness in economics.  For a motion *in limine* under Daubert, "'[i]t is the proponent of the expert who has the burden of proving admissibility' … by a preponderance of the evidence."  Henricksen v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1147, 1154 (E.D. Wash. 2009) (quoting Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir. 1996)).  As such, plaintiffs, as

---

[1] Neither plaintiffs nor defendant has requested a Daubert hearing.  Moreover, the "trial court has discretion not to hold pretrial evidentiary reliability hearing in carrying out its gatekeeping function …."  United States v. Díaz, 300 F.3d 66, 74 (1st Cir. 2002) (citing United States v. Nichols, 169 F.3d 1255, 1262–64 (10th Cir. 1999)).  Because, as seen in the forthcoming analysis, "no novel challenge is raised" by defendant's motion *in limine* (D.E. 43), it is unnecessary to hold a Daubert hearing.  United States v. Pena, 586 F.3d 105, 115 (1st Cir. 2009); cf. Samaan v. St. Joseph Hosp., 764 F. Supp. 2d 240, 246 (D. Me. 2011) (noting that it is "routine" and within the trial court's discretion to hold a Daubert hearing "[w]hen a serious issue of scientific reliability has been raised").

"the proponent[s] of the evidence," must "show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." <u>Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F.3d 77, 85 (1st Cir. 1998).

As an initial matter, it appears that Dr. del Valle's qualifications to testify as an expert witness are uncontested.  With respect to Dr. del Valle's principles and methods under Rule 702, his expert report indicates that he used an analytical method referred to as the Life-Participation and Employment ("LPE") methodology and that the same is commonly accepted and established in forensic economics.  (D.E. 43-1, at 2).  Under this methodology, one arrives at the present value of a particular person's expected lifetime earnings by summing the present value of the person's expected earnings at each age.  <u>Id.</u> at 4 (quoting Hugh Richards, <u>Life and Worklife Expectancies</u> 101 (1999)).  For a particular age, expected earnings are estimated as the joint LPE probability multiplied by an earnings amount, which could be based on, for instance, projections of past earnings or statistical data.  <u>Id.</u>  The LPE probability is found by multiplying the probability that a person will survive through a subsequent age from the initial age, the probability of labor force participation, and the probability of employment.  <u>Id.</u>  Defendant provides no evidence that the Life-Participation and Employment methodology is not "sufficiently reliable" to be admitted.  <u>See</u> <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 582 F.3d 156, 198 (1st Cir. 2009).

Rather, defendant alleges that Dr. del Valle improperly excluded two years' worth of earnings data in his computation of the projected earnings amounts of plaintiff Omar Martínez Morales ("plaintiff" or "Martínez").  In his report, Dr. del Valle lists plaintiff's historical earnings from 2003, when plaintiff was 18, to 2010.  (D.E. 43-1, at 7).  Nevertheless, when calculating plaintiff's projected earnings amounts, Dr. del Valle assumes earnings of $25,004

beginning in 2010, which is found by using plaintiff's 2008 earnings amount of $23,140 and applying an annual average rate of growth of 3.95%—the annual average rate of increase of the federal minimum wage between 1970 and 2009—for the years 2009 and 2010.  Id. at 8 & n.5.

When asked about the exclusion of plaintiff's actual earnings data for years 2009 and 2010 during his deposition, Dr. del Valle stated that, "[i]f the series is consistent," it would be correct "to consider all of the claimant's earnings history … through the date of the accident." (D.E. 43-3, at 18:1–7).  As such, Dr. del Valle testified that he would have used earnings data from 2009 and 2010 had there been an earnings history which included cycles in the construction industry and the observations "reflected … the trend of the cycle."   Id. at 37:16–38:5.   In plaintiff's case, however, Dr. del Valle testified that he "d[id]n't know" whether the reduction in plaintiff's earnings in 2009 was "part of a cycle" or if it was an example of "one year in which your earnings either go down dramatically or go up dramatically," because "that's the last observation that [he] ha[d]."  Id. at 18:22–19:8.  As such, it was an "atypical observation … for which [he] d[id]n't have an explanation," which "usually is left out."  Id. at 16:15–17, 18:14.

Defendant argues that "the actual trend in the construction industry in Puerto Rico" establishes that "the reduction in Mr. Martínez's yearly earnings was consistent with economic problems faced by the construction industry in general."  (D.E. 43, at 11).  According to defendant, the testimony of supervisors at Mar-Land Industrial Contractors, Inc. ("Mar-Land"), plaintiff's employer, indicated that Mar-Land "operations were in fact closed for a period of time after the accident suffered by Omar Martínez, and resumed during 2012."  Id.

As an initial matter, defendant's contentions regarding the state of the construction industry in Puerto Rico during 2009 and 2010 constitute mere assertions.  Defendant does not attach or cite to particular portions of depositions of Mar-Land supervisors to support its

proposition that Mar-Land operations were closed between Martínez's accident in 2010 and 2012.  Even assuming that Mar-Land operations were closed for a period of time after plaintiff's accident, defendant presents no evidence as to the reason for said closure.  As such, any factual conclusions made as to the nature of the Puerto Rico construction industry based on the pending motion *in limine* would be sheer speculation.

This is ultimately a question of the factual premises of Dr. del Valle's testimony.  "When the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury."  Moya-Soto v. Hosp. Dr. Cayetano Coll y Toste, Inc., Civ. No. 08-2024 (JAF), 2010 WL 234830, at *2 (D.P.R. Jan. 14, 2010) (quoting Newell Puerto Rico, Ltd. v. Rubbermaid Inc., 20 F.3d 15, 21 (1st Cir. 1994)).  Rule 702's requirement of "sufficient facts or data … is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  Fed. R. Evid. 702 advisory committee's note.  At trial, defendant will have the opportunity to challenge the expert testimony of Dr. del Valle both through cross-examination and the introduction of competing expert testimony.

Furthermore, it is not clear that defendant's focus on the portion of the LPE equation representing earnings in assessing whether Dr. del Valle's analysis considers economic downturns or other industry-wide "economic problems" is properly placed.  Rather, it appears to be the probabilistic portion of the equation—rather than the earnings amount—that incorporates the potential for economic variability.  According to Dr. del Valle's report, the LPE methodology "accounts for periods of unemployment"—or "involuntary leisure"—through its use of the life, participation, and employment probabilities, which "transform *projected* earnings into *probable* earnings."  (See D.E. 43-1, at 4 (emphasis in original)).  Specifically, the employment probability

considers "the percentage of persons in the labor force who are actually working"; in other words, it is "equivalent to one minus the unemployment rate." Id.  As such, according to Dr. del Valle, the LPE methodology "incorporates the probability of," for instance, the unemployment period between July 2009 and January 2010 "occurring in the future." Id. at 6 n.3.

Defendant also argues that, "[w]hen addressing the damages category of lost earning capacity," economists "estimat[e] the expected loss of earning capacity, rather than the capacity in the sense of what it has been at its greatest or might possibly be." (D.E. 60, ¶ 2 (citing Michael L. Brookshire & Shelly E. Caruthers, Principles of Establishing the Lost Earnings Base, 1 Litig. Econ. Dig. 45, 45 (1995)).[2]  Defendant contends that Dr. del Valle "[i]n effect … employed a capacity approach in computing the earnings base for Omar Martínez." Id. ¶ 4.  As discussed above, however, Dr. del Valle indicates in his expert report that he "follow[ed] the commonly accepted and established methodology in forensic economics known as the Life-Participation and Employment methodology." (D.E. 43-1, at 2).  Under this approach, one calculates "[t]he present value of expected lifetime earnings," not the greatest future earnings or other measure. Id. at 4.  Dr. del Valle expressed that the actual earnings data from 2009 was excluded on the basis of being an *atypical* observation, not on the basis of being a *smaller* observation.  At his deposition, Dr. del Valle testified that, had there been "a dramatic increase in income," he "wouldn't have used it, either." (D.E. 43-3, at 18:9–11).  Moreover, Dr. del Valle's use of an employment probability less than one recognizes that plaintiff would not be expected to receive the full earnings amount each year, with the assumed growth rate of 3.95%.

---

[2] Although the article ultimately concludes that economists "are estimating the *expected* loss of earning capacity, rather than capacity in the sense of what it has been at its greatest or might possibly be," it should be noted that the article also states that "a debate has arisen as to whether forensic economists are, or should be, estimating lost earning capacity that is expected versus 'capacity' in the sense of what earnings have been at their greatest or might possibly be." Brookshire & Caruthers, supra, at 45, 59–60 (emphasis in original).

According to defendant, "if Omar Martínez experienced an 'atypical' year with lower or higher earnings, the forensic economist should nonetheless consider the entire earnings history." (D.E. 60, ¶ 4).  Although defendant cites the aforementioned article by Brookshire and Caruthers for the proposition that an economist should estimate the expected loss of earning capacity, it does not provide support for its contention that an analysis of expected loss of earning capacity requires an economist to consider atypical years in the calculation.  In response to being asked to use plaintiff's "complete earnings history for purposes of computing average income," Dr. del Valle responded that "it's obvious from the data that if I start in 2005 and use 2009 as a typical observation, then I would say that Mr. Martínez's earnings would decrease consistently throughout the years," which is "definitely not a good assumption to make for a long period of term."  (D.E. 43-3, at 19:9–19).  Ultimately, Dr. del Valle "should be permitted to testify as to [his] inferences and conclusions," and "any flaws in his opinion may be exposed through cross-examination or competing expert testimony."  Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 308 (D. Me. 2005).

Additionally, defendant argues that if one created an estimate of plaintiff's projected earnings amount in 2010 based on plaintiff's first six and a half months of earnings in 2010, one arrives at an earnings amount of $16,116.84, in contrast with Dr. del Valle's estimate of $25,004. (D.E. 60, ¶ 7).  As Dr. del Valle states, however, the nature of determining plaintiff's expected earnings over the course of forty years is long-term.  (See D.E. 43-1, at 7).  This is why, for instance, Dr. del Valle used the rate of increase of the federal minimum wage (3.95%) rather than the higher but short-term actual "rate of increase of earnings enjoyed by Mr. Martínez" (5.96%).  Id.  Dr. del Valle notes that, "'[i]n "real life", many people take breaks from periods of employment to further their education, raise families recuperate from severe illness [sic], or

temporarily drop out for other voluntary and involuntary reasons.'"  Id. at 3 (quoting Richards,

supra, at 51).  In contrast, when calculating "'[w]orklife expectancies, … all expected period of

future participation'" must be "'combine[d] … into a single number.'"  Id.  It is precisely Dr. del

Valle's contention that plaintiff's earnings data after 2008 was atypical when compared with the

2005 to 2008 period.[3]  Dr. del Valle similarly testified that he did not include plaintiff's earnings

data before 2005, because plaintiff was not "fully employed and it would have given [him] a

much larger, much bigger rate of increase of earnings."  (D.E. 43-3, at 16:10–13).  As such,

Dr. del Valle "took 2005 to 2008 as the representative period."  Id. at 16:13–14.  The purpose of

the analysis does not appear to be predicting the actual earnings plaintiff would have received in

any given year, but rather making a "long term … projection" of plaintiff's earnings.  (D.E. 43-1,

at 7).

        A party seeking to use expert testimony "'need not prove to the judge that the expert's

testimony is correct, but she must prove by a preponderance of the evidence that the testimony is

reliable.'"  United States v. Monteiro, 407 F. Supp. 2d 351, 356 (D. Mass. 2006) (quoting Moore

v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998)).  Whether plaintiff's earnings data

2009 and 2010 should be considered atypical observations is a question "affect[ing] the *weight* to

be assigned that opinion rather than its *admissibility*" and as such should "be left for the jury's

consideration."  Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004)

(emphasis in original) (internal quotation omitted).

---

[3] Along these lines, defendant's calculation of $16,116.84 for 2010 is a smaller figure than any of the figures for plaintiff's annual earnings between 2005 and 2008, which range from $17,744 to $23,140.  (See D.E. 43-1, at 7).

**II.**     **CONCLUSION**

For the foregoing reasons, defendant's motion *in limine* (D.E. 43) requesting exclusion of the testimony and opinions of plaintiffs' expert witness Dr. Jaime L. del Valle Caballero under Rule 702 of the Federal Rules of Evidence is hereby **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 5th day of June, 2013.

s/Marcos E. López
U.S. Magistrate Judge
