IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| OMAR MARTÍNEZ-MORALES, et al., | |
| Plaintiffs, | |
| v. | CIVIL NO. 11-1660 (MEL) |
| VICTAULIC CO., et al., | |
| Defendants. | |

**OPINION AND ORDER**

Pending before the court is a motion *in limine* filed by defendant Victaulic Co. ("defendant" or "Victaulic"), along with plaintiffs' response in opposition, defendant's reply, and plaintiffs' surreply. (D.E. 39; 48; 61; 72). Defendant seeks the exclusion of the testimony of plaintiffs' expert witness Dr. Richard Avilés Michel ("Dr. Avilés") under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).[1]

**I. ANALYSIS**

Plaintiffs seek to present testimony from Dr. Avilés as an expert witness in neuropsychology. For a motion *in limine* under Daubert, "'[i]t is the proponent of the expert who has the burden of proving admissibility' … by a preponderance of the evidence." Henricksen v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1147, 1154 (E.D. Wash. 2009) (quoting Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir. 1996)). As such,

---

[1] The "trial court has discretion not to hold pretrial evidentiary reliability hearing in carrying out its gatekeeping function …." United States v. Díaz, 300 F.3d 66, 74 (1st Cir. 2002) (citing United States v. Nichols, 169 F.3d 1255, 1262–64 (10th Cir. 1999)). Because, as seen in the forthcoming analysis, "no novel challenge is raised" by defendant's motion *in limine* (D.E. 39), it is unnecessary to hold a Daubert hearing. United States v. Pena, 586 F.3d 105, 115 (1st Cir. 2009); cf. Samaan v. St. Joseph Hosp., 764 F. Supp. 2d 240, 246 (D. Me. 2011) (noting that it is "routine" and within the trial court's discretion to hold a Daubert hearing "[w]hen a serious issue of scientific reliability has been raised").

plaintiffs, as "the proponent[s] of the evidence," must "show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).

According to defendant, Dr. Avilés's testimony is inconsistent with the evidentiary record and, as such, is not "based on sufficient facts or data" pursuant to Rule 702. Fed. R. Evid. 702(b). The rule's requirement of "sufficient facts or data," however, "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 advisory committee's note. As such, there merely must be "a plausible evidentiary basis for an expert's opinion." Downeast Ventures, Ltd. v. Washington Cnty., No. 05-87 BW, 2007 WL 679887, at *2 (D. Me. Mar. 1, 2007).

""[A]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony.'" Morales v. Monagas, 723 F. Supp. 2d 411, 416 (D.P.R. 2010) (quoting Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 308 (D. Me. 2005)). Correspondingly, "questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration." Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004) (emphasis in original) (internal quotation omitted). "It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the [factfinder] must such testimony be excluded." Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) (internal quotation omitted). In other words, "'when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a [factfinder]'s verdict.'" Sullivan v. Nat'l Football League, 34 F.3d 1091, 1105 (1st Cir. 1994) (quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S.

209, 242 (1993)).  A crucial element of this analysis, therefore, is whether the contradictory record facts are indisputable.  If the contradictory facts are at issue in a case, then the expert testimony, if otherwise admissible, may be presented to the factfinder.  Cf. Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1988) ("The bulk of [defendant]'s arguments against admissibility are simply a rehashing of [a] central factual dispute[] of the case dressed up as attacks on the expert's testimony through Rule 703.").

Defendant contends that the factual assumptions that plaintiff Omar Martínez ("plaintiff" or "Martínez") lost consciousness after the accident on July 13, 2010, and was disoriented and vomited blood and food content upon recovering from unconsciousness are not supported by the evidentiary record.  (D.E. 39, at 8–9 (citing D.E. 39-1, at 2; D.E. 39-3, at 23–24)).  Defendant points out that the records of Hospital HIMA San Pablo Caguas ("HIMA") indicate that Martínez "denie[d] loss of consciousness."  Id. at 10; (D.E. 50-1, at 5).  Moreover, as interpreted by Dr. Avilés in his deposition, the HIMA records also indicate that plaintiff was conscious, alert, and "oriented in all spheres."  Id.; (D.E. 39-2, at 33:15–34:2).  According to defendant, Dr. Avilés acknowledged that there is no medical entry from the HIMA medical record which indicates that plaintiff had vomited blood and food.  (D.E. 39, at 10–11 (citing D.E. 39-2, at 27)).

Defendant states that, in making these factual assumptions, Dr. Avilés "rel[ied] heavily on information provided by Omar Martínez and his mother, Lelis Morales" ("Morales").  Id. at 10.  In particular, Dr. Avilés testified that, during his clinical interview with Martínez, plaintiff stated that, after being hit with "particles of [a] valve" at work, "he had lost consciousness for a period of time, which he was not able to specifically identify."  (D.E. 39-2, at 23:21–24:2).  According to Dr. Avilés, Martinéz "indicated that he had a vague recall upon awaking."  (D.E. 39-1, at 2).  Dr. Avilés stated that, according to Morales, Martínez "was in a state of confusion,

3

possibly, when [medical personnel] asked th[e] question" pertaining to loss of consciousness. (D.E. 39-2, at 25:15–26:3). Dr. Avilés's report indicates that, according to Morales, Martínez "began vomiting with blood and food content" upon "recovering from unconsciousness." (D.E. 39-1, at 2). Moreover, in his report, Dr. Avilés cites a psychiatric medical report dated December 22, 2011, performed by Dr. Milagros Ortiz Tavarez ("Dr. Ortiz"), which indicates that Martínez was first seen on December 22, 2010, and was "initially diagnosed with severe depression and recurrent headaches associated to frontal lobe fracture with loss of consciousness." Id. at 4.[2]

Similarly, defendant argues that Dr. Avilés "failed to consider all the evidence obtained and/or available in the case," such as the depositions and plaintiffs' discovery responses. (D.E. 39, at 7–8). Defendant contends that this implies that Dr. Avilés "did not verify or corroborate the information obtained from Plaintiffs during the two intake interviews conducted on September 18 and 19, 2012, with factual data that was readily available from independent factual witnesses." Id. at 8. Defendant cites to no authority for the proposition that a witness must verify or corroborate each piece of evidence on which said witness relies in order to be considered an expert under Rule 702. Rather, as discussed above, the proper standard is whether Dr. Avilés had a plausible evidentiary basis for reaching his opinion. "The fact that [the witness] could have reviewed other materials in formulating his opinion does not disqualify him as an expert." Rich v. City of Savannah, No. 1:02-1222 T/P, 2005 WL 6739798, at *3 (W.D. Tenn. Aug. 25, 2005). "Rule 702 … does not require that an expert consider all relevant evidence[,] … only [that] the expert's testimony … be based on sufficient facts and data to make the testimony reliable." Id.

---

[2] The "concluding psychiatric diagnosis" from Dr. Ortiz's report was "severe mayor [*sic*] depression with psychotic manifestation." (D.E. 39-1, at 4).

4

Even where "the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." Moya-Soto v. Hosp. Dr. Cayetano Coll y Toste, Inc., Civ. No. 08-2024 (JAF), 2010 WL 234830, at *2 (D.P.R. Jan. 14, 2010) (quoting Newell Puerto Rico, Ltd. v. Rubbermaid Inc., 20 F.3d 15, 21 (1st Cir. 1994)). Simply because Dr. Avilés "rel[ied] heavily" on information obtained from Martínez and Morales does not mean that his opinions are not based on sufficient facts or data for purposes of Rule 702. It is clear that Dr. Avilés has a plausible evidentiary basis for determining that Martínez lost consciousness, was disoriented, and vomited food and blood after awaking. As such, the credibility of Dr. Avilés's testimony is an issue which "should be left for the jury's consideration." Primrose Operating Co., 382 F.3d at 562 (internal quotation omitted).

In his report, Dr. Avilés states that that Martínez claimed that he suffered from severe recurrent headaches, occurring several times a week, and that he went to the HIMA Emergency Ward on five occasions because he was "unable to tolerate the excruciating pain." (D.E. 39-1, at 5). Defendant states that "Dr. Avilés acknowledged that he had never seen the medical records for any of the alleged emergency room visits, and that he had no knowledge whether said medical records had even been produced." (D.E. 39, at 11). As such, "[i]t necessary follows that Dr. Avilés had no independent corroboration as to whether those alleged emergency room visits even took place." Id. Defendant, however, presents no evidence indicating that Martínez visited the HIMA Emergency Ward fewer than five times as a result of his headaches. Defendant does not even *assert* that Martínez did not visit the HIMA Emergency Ward fewer than five times, focusing only on the alleged lack of "independent corroboration" for Dr. Avilés's conclusion. Id. Nevertheless, defendant makes no argument as to why independent corroboration would be

required regarding the number of times Martínez visited the HIMA Emergency Ward for his headaches or as to why Martínez would not be competent as an informant regarding said fact.

Dr. Avilés indicates that Martínez "claim[ed] that he is unable to work due to the severe impairing pain, medical, cognitive and emotional symptoms suffered caused by the [traumatic brain injury] received on July 13, 2010." (D.E. 39-1, at 10). In contrast, defendant states that Dr. Arce of the State Insurance Fund Industrial Hospital indicated on April 14, 2011, that, "after the surgeries correcting to ptosis and the orbital fracture," plaintiff "c[ould] return to work." (D.E. 39-2, at 62:16–24). According to defendant, "Dr. Avilés takes the Plaintiff's self-serving statement as truth and posits that Omar Martínez will be unable to work for the rest of his life." (D.E. 39, at 12). Nonetheless, defendant does not cite to any portion of either Dr. Avilés's report or deposition indicating that he took plaintiff's statement "as truth" or concluding that plaintiff would be "unable to work for the rest of his life." Id. In his report, Dr. Avilés does conclude that plaintiff's "conditions and symptoms are chronic in nature and will continue to some degree throughout the course of the patient's life time," but it is not readily apparent that he also determines that plaintiff can never work again or that he bases said conclusion on plaintiff's inability to work.[3] (D.E. 39-1, at 11).

Ultimately, Dr. Avilés concluded that plaintiff experienced major depression, among other conditions and symptoms, as a result of a traumatic brain injury ("TBI") received on July 13, 2010. (D.E. 39-1, at 11). When asked whether there is "any clinical support for the occurrence of traumatic brain injury in the medical records," Dr. Avilés responded in the negative, stating that "[t]raumatic *head* injury is what has been mostly used." (D.E. 39-2, at

---

[3] Rather, Dr. Avilés stated at the deposition that "the bases of this opinion were the findings on the testing that [he] had done, the various areas that [he] had found, signs that were consistent with the losses in these areas and the clinical manifestation of the patient and the mood tests that were used for assessing depression and assessing anxiety." (D.E. 39-2, at 64:23–65:16).

6

58:24–59:8 (emphasis added)). Similarly, Dr. Avilés agreed that there were "no clinical entries in the medical records that evidence a traumatic brain injury." Id. at 66:5–8. Moreover, Dr. Avilés acknowledged that the MRI tests and CT scans that were performed, respectively, "were all normal" and "showed no laceration to the brain." Id. at 59:9–17.

Dr. Avilés, however, stated that he was "the one who assesse[d] that the traumatic brain injury occurred because of the dysfunctions [he] found" and that he based his determination on the neuropsychological evaluations which he performed. Id. at 58:21–23, 61:3–7. Specifically, according to his report, Dr. Avilés conducted the following evaluations:

> Clinical Interview of Mr. Omar Martinez, Clinical Interview of Mrs. Lelis Morales Perez, Mental Status Examination, Wechsler Intelligence Scale for Adults - III (Spanish Version), Raven Standard Progressive Matrices, Bender Gestalt Visual Motor Test, Raven Standard Progressive Matrices (ABCDE), Rey Complex Figure Test, Stroop Color Word Test, Trail Making Tests A & B, Mental Status Examination, Rey Auditory Verbal Learning Test, Beck Depression Inventory, Beck Anxiety Inventory, DSM-IV-TR MultiAxial Diagnosis System

(D.E. 39-1, at 1). The results of these tests include, for instance, high variability on subtests ranging from extremely low to above average; a score on the Raven Standard Progressive Matrices reflecting the "inferior limit of the normal average classification"; deficits on attention, concentration, sequencing, simultaneous processing and mental flexibility, which Dr. Avilés notes "have been associated to the frontal lobe traumatic brain injury"; and scores within the "severe" range of the Beck Depression Inventory-II Spanish Version and the Beck Anxiety Inventory. Id. at 5–9. In his deposition, when asked about plaintiff's MRI tests and CT scans, Dr. Avilés stated that one "do[es] not necessarily have to have visual MRI signs of brain damage to have brain damage" and that "[t]here's substantial literature that indicate that you can have brain damage and some of these instruments may not be sensitive to that type of a finding." (D.E. 39-2, at 59:20–25).

7

Dr. Avilés is qualified to be an expert in neuropsychology under Rule 702. He received his master's degree in clinical psychology from the Caribbean Center for Postgraudate Studies in 1975 and his doctoral degree in clinical psychology from Universidad Carlos Albizu in 1991. (D.E. 65-2, at 1). He was the director of neuropsychology at San Juan City Hospital from 1978 to 2006, and a neuropsychology professor at the Ponce School of Medicine and Health Science between 2000 and 2012. Id. at 3–4.[4] Moreover, defendant has articulated no argument that the specific tests performed by Dr. Avilés do not constitute reliable principles and methods by which a neuropsychologist can determine whether a TBI exists or has occurred. Defendant has pointed to no evidence contradicting Dr. Avilés's contention that there is "substantial literature" indicating that brain damage can exist despite the inability of MRI tests and CT scans to detect the same. Id. As such, given that Dr. Avilés testified that he reached the diagnosis of TBI on the

---

[4] Although defendant does not contest Dr. Avilés's qualifications with regards to the instant motion (see D.E. 39; 61), defendant argues in a reply (D.E. 59) relating to a separate motion *in limine* (D.E. 41) that, because Martínez is neither a neurologist nor a medical doctor, Dr. Avilés is not qualified to diagnose him with TBI. (D.E. 59, ¶ 4). This court has previously found a neuropsychologist to be "qualified to render expert testimony" on mild traumatic brain injury allegedly resulting from a car accident. Bado-Santana v. Ford Motor Co., 482 F. Supp. 2d 192, 196 (D.P.R. 2007). The fact that a neuropsychologist "is not a neurologist or physician does not resolve whether []he is qualified to render expert testimony" on mild traumatic brain injury. Id. at 195 (citing United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) ("Expertise is not necessarily synonymous with a string of academic degrees or multiple memberships in learned societies.")). As the court pointed out in Bado-Santana, "the American Psychological Association has stated that neurological examinations are very limited in their capacity to detect brain damage, and that neuropsychological testing is the only means of diagnosing some forms of brain damage." 482 F. Supp. 2d at 195. As a result, the Bado-Santana court concluded that the neuropsychologist was qualified to testify as an expert witness on the issue of mild traumatic brain injury. Defendant cites a case by the Circuit Court of Virginia, City of Portsmouth, in which the court addressed the question of whether, under Virginia law, "the Virginia Supreme Court would permit a neuropsychologist to testify to causation as another exception to the general rule" set forth by the Virginia Supreme Court that "only a medical doctor may render an opinion regarding the cause of a physical human injury." McCarthy v. Atwood, 2005 WL 937271, at *5 (Va. Cir. Ct. 2005) (internal quotation omitted). The court found that it would not. Id. at *7. Unlike in McCarthy, the binding standard—as in Bado-Santana—is Rule 702, not Virginia law. Defendant has not cited any authority indicating that Rule 702 in its current form requires experts testifying about the cause of a physical human injury to be a medical doctor. As such, Bado-Santana is more persuasive on this issue. Moreover, neither Chapple v. Ganger, 851 F. Supp. 1481 (E.D. Wash. 1994), nor In re Air Crash at Little Rock Arkansas, on June 1, 1999, 291 F.3d 503 (8th Cir. 2002), is applicable to the instant case. Chapple is distinguishable from the pending Daubert motion because it involves a court's findings of fact and conclusions of law following a two-day bench trial, not the court's threshold inquiry under Rule 702 and Daubert. Air Crash is also distinguishable, as it holds that an expert "should not be allowed to opine that [an individual] actually has a physical brain injury unless tests are performed which objectively support this conclusion." 291 F.3d at 515. Here, as discussed above, Dr. Avilés conducted extensive neuropsychological testing on Martínez to reach the conclusion that he suffered from a TBI.

basis of said tests, as opposed to the medical record, and given that Dr. Avilés testified that TBI would not necessarily appear on MRI tests or CT scans, no viable reason has been presented to preclude Dr. Avilés's testimony pertaining to TBI.

Finally, defendant argues that Dr. Avilés acknowledged that "a series of cognitive problems" which Martínez suffered from, "includ[ing] poor reading skills and reading comprehension," predated and thus were unrelated to the accident in question. (D.E. 39, at 13 (citing D.E. 39-2, at 65)). Specifically, defendant refers to the following exchange at the deposition, which followed defense counsel's reading of Dr. Avilés's diagnostic impression:

> Q   What is the basis for this opinion?
>
> A   Oh, the bases of this opinion were the findings on the testing that I had done, the various areas that I had found, signs that were consistent with the losses in these areas and the clinical manifestation of the patient and the mood tests that were used for assessing depression and assessing anxiety.
>
> Q   But here today when we've gone through some of the test results and when you've discussed Omar's academic history, you agreed with me that some of those conditions, some of those cognitive problems, were preexisting?
>
> A   Yes.
>
> Q   And were unrelated to the accident?
>
> A   Yes, yes.
>
> Q   So those would not necessarily be, then, associated with traumatic brain injury, which as you have testified you've diagnosed traumatic brain injury based on your evaluations?
>
> A   Yes.

(D.E. 39-2, at 65:17–66:4). Neither plaintiffs nor defendant have brought to the attention of the court any citation to the previous exchange in the deposition between defense counsel and Dr. Avilés referred to within this excerpt. Nevertheless, earlier in the deposition, the following exchange occurred regarding Dr. Avilés's assessment of plaintiff's deficit in reading cognition:

9

> Q And you're not sure if this second or third grade level of reading, if that's something that was preexisting or if it was something that's the result of the accident?
>
> A Well, I would say that part of it was preexisting; but the severity, the increased severity, of his reading, I attributed to the head trauma.
>
> Q And why is that?
>
> A Well, like I told you before, he had a -- he has demonstrated a history of having performed certain tasks which were above that level of reading comprehension.

Id. at 50:5–16. Moreover, Dr. Avilés's report indicates that certain cognitive deficits "were associated to the TBI received on July 13, 2010," not that they were exclusively caused by the TBI. (D.E. 39-1, at 11). Once again, defendant does not appear to contest Dr. Avilés's qualifications or his principles and methods used to arrive at his diagnostic impression. As such, particularly considering Dr. Avilés's testimony that, although "part of" Martínez's difficulties with reading "was preexisting," the "increased severity" of said difficulties is "attributed to the head trauma," (D.E. 39-2, at 50:5–16), Dr. Avilés's acknowledgement that "some of those cognitive problems … were preexisting," id. at 65:17–66:4, does not necessarily constitute an admission that the aggravation of said cognitive problems was not "associated to the TBI," (D.E. 39-1, at 11).

## II. CONCLUSION

For the foregoing reasons, defendant's motion *in limine* (D.E. 39) requesting exclusion of the testimony and opinions of plaintiffs' expert witness Dr. Richard Avilés Michel under Rule 702 of the Federal Rules of Evidence is hereby **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 5th day of June, 2013.

s/Marcos E. López<br>
U.S. Magistrate Judge